# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 1411017691 |
| | ) | |
| JACQUEZ ROBINSON | ) | |

Submitted: February 2, 2018
Decided: May 1, 2018

## OPINION

*Upon Defendant's Motion to Dismiss Indictment*
**GRANTED**

Sean P. Lugg, Esq., Carolyn S. Hake, Esq., Department of Justice, Attorney for the State of Delaware

Patrick J. Collins, Esq., Collins & Associates, Attorney for Jacquez Robinson

**Rocanelli, J.**

Defendant Jacquez Robinson ("Defendant") has filed a motion to dismiss on the grounds that the State violated his Sixth Amendment rights by conducting an unauthorized search of Defendant's cell that specifically targeted Defendant's attorney-client communications; by reviewing confidential communications between Defendant and his counsel; by intentionally intruding on the attorney-client relationship; and by actual disclosure of defense strategy to the prosecution. Defendant further contends that the only adequate remedy for the constitutional violation is dismissal of the indictment. The State responds that the search was permissible and/or justified, and that Defendant has not established sufficient prejudice to establish a Sixth Amendment violation or to warrant dismissal of the indictment.

## INTRODUCTION

This Court issued a Memorandum Opinion and Order, which set forth the Court's rulings on the standard and scope of review for consideration of Defendant's motion to dismiss.[1] The Court conducted evidentiary hearings and an *in camera* review of legal documents and attorney-client communications seized from Defendant's prison cell. The parties submitted post-hearing briefs. Thereafter, the Court took Defendant's motion to dismiss under advisement.

---

[1] *See State v. Robinson*, 2017 WL 4675760 (Del. Super. Sept. 19, 2017, revised Oct. 17, 2017). The findings and rulings in that Memorandum Opinion are incorporated herein.

This is the Court's decision on Defendant's motion to dismiss. As fact-finder, the Court assessed the evidence and the credibility of witness testimony.[2] The Court finds that the State intentionally seized and reviewed Defendant's attorney-client communications without seeking judicial approval or oversight. The State also failed to establish a "taint team" to screen the Trial Prosecutors from the results of its investigation, and a member of the prosecution team[3] learned details of Defendant's defense strategy. The Court concludes that the State's conduct violated Defendant's Sixth Amendment right to the assistance of counsel and that the State's conduct falls short of the Court's expectations for Delaware prosecutors.

Based on the Court's findings of fact, application of the legal standard, and in consideration of the State's disregard for procedural due process and the rule of law, this Court concludes that dismissal of the Indictment is necessary to remedy the State's intentional violation of Defendant's Sixth Amendment rights. While the Court is mindful that dismissal is an extreme remedy, no other remedy will adequately and effectively address the Sixth Amendment violation for this defendant or deter the State from violating the Sixth Amendment rights of criminal defendants in the future.

---

[2] *Dionisi v. DeCampli,* 1995 WL 398536, *1 (Del. Ch. June 28, 1995).
[3] The Prosecution Team for Defendant's Murder Case consisted of two Deputies Attorney General ("Trial Prosecutors") and a paralegal ("Prosecution Team Paralegal").

DISCUSSION

I.    **THE STATE'S SEIZURE, REVIEW AND RETENTION OF DEFENDANT'S LEGAL MATERIALS**

A.    *Unauthorized Seizure, Review, and Retention of Defendant's Legal Materials*

On June 30, 2017, eleven days before the scheduled July 11 trial in Defendant's Murder Case,[4] the State seized all documents and notes from Defendant's prison cell for its review. A senior prosecutor at the Delaware Department of Justice authorized the seizure and review ("Senior Prosecutor").[5] According to the State, the search and seizure was necessary to ascertain whether Defendant's counsel ("Defense Counsel")[6] had violated a protective order by revealing the names of the State's witnesses to Defendant. However, the State concedes that it never provided any witness names to Defense Counsel.

The State did not apply for a search warrant in any court. The State did not provide notice in advance to Defense Counsel or to the judges assigned to the TMG Case or the Murder Case. Even after the search and seizure took place, the State did

---

[4] Defendant has multiple indictments pending in this Court, which were explained in detail in the Court's previous Opinion and Order. *See Robinson*, 2017 WL 4675760, at *1.

[5] Senior Prosecutor is not a member of the Prosecution Team for any of Defendant's pending cases.

[6] Defense Counsel represents Defendant in both of his pending cases, the TMG Case and the Murder Case.

not disclose the search, seizure, and review of documents to the Court or to Defense Counsel.

Several days later, on July 5, 2017, Defendant informed Defense Counsel that Defendant's legal papers had been removed from his cell by Department of Correction ("DOC") officials. Defense Counsel first notified the Court by e-mail on July 5, and then sent a formal letter to the Court on July 6. Defense Counsel did not know that the Department of Justice ("DOJ") had directed the DOC to conduct the search and seizure. Defense Counsel asked the Court to enter an Order directing that all of Defendant's legal documents be returned immediately and that copies not be made or retained. The Court asked for a response from the State by noon on July 7, 2017. A formal response was filed on behalf of DOC.[7] It was only after the Court intervened that the State made arrangements to return Defendant's legal materials to him, which were returned before the end of the day on July 7.[8]

---

[7] In a letter dated July 7, 2017 to Hon. John A. Parkins, the DOC notified the Court that "[a]t the request of Department of Justice investigators, the DOC did conduct a search of Robinson's cell on June 30, 2017, and did remove materials from his cell, including legal materials." Mot. to Dismiss Ex. F. (July 7, 2017).

[8] After a detailed review of the documents seized from Defendant's cell, the Prosecution Team Paralegal suggested that the documents should be returned to Defendant. On July 1, 2017, the day after the seizure and review, Prosecution Team Paralegal wrote an email stating that "since [Defendant] was allowed to have all of the seized documents, we should probably arrange for them to be returned." Senior Prosecutor responded to this email, saying "Makes sense." J. Ex. 8 at 17. The documents were returned to Defendant on July 7, 2017.

### B.     *The TMG Protective Order*

In criminal cases, the State is not required to produce a witness's statement to defense counsel until after the witness testifies at trial on direct examination.[9]  In addition, the Delaware Victims' Bill of Rights prohibits the disclosure of a victim's or witness's identifying information.[10]  However, in the interest of convenience and judicial economy, the State ordinarily provides witness statements to defense counsel before trial.  To do so, the State typically utilizes a protective order that prohibits defense counsel from sharing a witness's statement or identifying information with anyone else, including the defendant.

There are two protective orders that address Defendant's pending cases.  On August 24, 2016, the Court issued a Protective Order for the TMG Case ("TMG Protective Order") in advance of an October 2016 trial date. That trial was postponed and the TMG Protective Order remains in effect.  On June 12, 2017, the Court issued a protective order in the Murder Case ("Murder Protective Order").  By its terms, the Murder Protective Order expired on July 6, 2017, five days prior to the trial scheduled for July 11, 2017.

The TMG Protective Order prohibited Defense Counsel from giving Defendant access to any documents containing summaries and transcripts of witness

---

[9] *See* Super Ct. Crim. R. 26.2(a).
[10] *See* 11 *Del. C.* § 9403.

interviews or which contained certain identifying information for witnesses. However, the TMG Protective Order permitted Defense Counsel to discuss the "content" of any such documents with Defendant.[11] During the drafting process for the TMG Protective Order, Defense Counsel sought clarification from the State on her duties thereunder. Specifically, Defense Counsel asked if the State considered it a violation if she were to summarize the protected documents, leaving out any witness identifying information, and to provide those summaries to Defendant. The State responded that the provision in the TMG Protective Order allowing counsel to discuss "content" permitted Defense Counsel "to discuss/provide summaries of the materials under the [protective order]."[12] Following this clarification, Defense Counsel wrote to the State to memorialize their discussion and said, "The State takes the position that there is no violation of the protective order by me sending summaries of reports and transcripts of statements of witnesses to my client so long as no identifying information is provided in the summaries. If this is not accurate, please let me know."[13] The State never responded.

Pursuant to the TMG Protective Order, the State produced various discovery materials to Defense Counsel. However, other than one witness identified by name,

---

[11] *See* J. Ex. 1 at A109-10.
[12] J. Ex. 1 at A133.
[13] J. Ex. 1 at A135.

the State never provided the names of any witnesses to Defense Counsel.[14]  Rather, the State identified the witnesses using letter designations and redacted the transcripts to remove any identifying information.

In March 2017, a jury trial took place for one of Defendant's co-defendants in the TMG Case.  At that trial, the State identified witnesses by name in its opening statement.  In addition, witnesses testified and were subject to cross examination on the record in open court.

In the beginning of May 2017, an inmate ("Informant Inmate") housed with Defendant at Sussex Correctional Institution ("SCI") wrote to the State claiming to have information relating to the Murder Case.  The Lead Trial Prosecutor for the Prosecution Team interviewed the Informant Inmate on May 10, 2017.  During that interview, the Informant Inmate identified Defense Counsel by her first name and suggested that she may have shown Defendant documents that were subject to a protective order.[15]  The Informant Inmate also told the Trial Prosecutor that Defendant attempted to use another inmate's ("Intermediate Inmate") pin number to

---

[14] *See, e.g.,* J. Ex. at A125-29; A130-32.  The name of only one witness was identified in the discovery materials subject to the State's *Brady* obligations because the witness provided exculpatory evidence.

[15] *See* App. to Post-Hearing Br. at A58 ("Nah, he showed me that one paper he tried to get a … some, I guess you got like a protective order on some statements or something where you not supposed to get or something, but [Defense Counsel] came and seen them. … [Defense Counsel] bought [*sic*] him this paper and said this is a test of our relationship.  If this get's [*sic*] out it's on you. …").

call Defense Counsel regarding the protected documents. The Informant Inmate stated that a paralegal for Defense Counsel told Defendant that he could not have copies of the documents because they were protected by a protective order.[16] The Informant Inmate claimed that these events took place sometime in April 2017. The only protective order in place at the time of these events was the TMG Protective Order.

The Trial Prosecutors claim that they were concerned at this time that Defense Counsel may have violated the TMG Protective Order.[17] Rather than raising the concerns at this time with the Court or with Senior Prosecutor, the Trial Prosecutors initiated further investigation ("Protective Order Investigation"). On May 16, 2017, a Trial Prosecutor interviewed the Intermediate Inmate, who denied allowing anyone to use his pin number to make outgoing phone calls.

The Trial Prosecutors waited several more weeks after the interview with the Intermediate Inmate to take any additional steps in connection with its Protective Order Investigation. In June 2017, the Trial Prosecutors issued three subpoenas

---

[16] *Id.* at A59 ("So he didn't talk to [Defense Counsel], he talked like to a paralegal … she said I talked to [Defense Counsel] about the paperwork, it's a protective order like she explained to you at the hearing and we can't give it to you, yada, yada.").

[17] Initially, the State represented that the Trial Prosecutors were concerned that both protective orders had been violated. However, the Murder Protective Order had not been issued at the time of the events about which the State claimed to be concerned. Eventually, the State conceded that the Trial Prosecutors' concerns related exclusively to the TMG Protective Order.

relating to their Protective Order Investigation. The first subpoena was issued on June 9, 2017 for Defendant's telephone records from the period of May 25, 2017 to the June 9, 2017.[18] The second subpoena was issued on June 14, 2017 for the Intermediate Inmate's telephone records for the period of January 1, 2017 to June 14, 2017.[19] The third subpoena was issued on June 20, 2017 for Defendant's telephone records to cover the period of April 1, 2017 through May 24, 2017.[20] All three subpoenas sought "any and all available approved phone number lists, outgoing call log entries and conversations" for the respective time period.[21] The State has produced no other subpoenas relating to the Protective Order Investigation.

Sometime before June 28, 2017, the DOC provided the State with Defendant's phone calls in response to the Trial Prosecutors' subpoenas. The recordings were given to a State Investigator who listened to them to determine if Defense Counsel had possibly violated the TMG Protective Order. On June 28, 2017, the State Investigator provided the Trial Prosecutors with transcripts of phone calls Defendant made in April 2017 in which Defendant discusses a meeting with Defense Counsel. The Trial Prosecutors still did not involve a "taint team," deciding instead to evaluate the substance of the phone calls themselves. During the phone calls, Defendant

---

[18] J. Ex. 8 at 1.
[19] *Id.* at 2.
[20] *Id.* at 3.
[21] *Id.* at 1-3.

9

states that Defense Counsel discussed his case and showed him some documents. Defendant also states that he knows people who may be witnesses against him. However, Defendant does not identify any witnesses by name or state that Defense Counsel provided him with witness names.

On the same day, the Trial Prosecutors also received the Intermediate Inmate's call log. The log indicated that someone using that pin number called Defense Counsel's office three times in April 2017.

On June 28, 2017, the Trial Prosecutors brought their concerns that a protective order may have been violated to the Senior Prosecutor. The Trial Prosecutors did not disclose Defense Counsel's previous clarifications regarding the parameters of the TMG Protective Order to the Senior Prosecutor.[22] On that same day that the Trial Prosecutors addressed their concerns with the Senior Prosecutor, the Senior Prosecutor assigned the State's Chief Investigator ("Chief Investigator") to work with DOC to search Defendant's cell. The State did not apply for a search warrant or otherwise seek judicial approval. In addition, the State did not create a "taint team" to screen the members of the Prosecution Team from its continuing investigation.

---

[22] *See* J. Ex. 1 at A135.

10

### C.  Defendant's Attorney-Client Communications and Legal Materials Were the Subject of Search and Seizure

In preparation for the review of documents seized from Defendant's prison cell, the Senior Prosecutor and the Lead Trial Prosecutor met with the Chief Investigator on June 28 or 29, 2017 to give the Chief Investigator instructions on what to look for in Defendant's cell.  At that time, the Senior Prosecutor and the Lead Trial Prosecutor knew that only one witness name had been provided under the TMG Protective Order.  They instructed the Chief Investigator to look for anything indicating that Defense Counsel showed Defendant protected documents in violation of the TMG Protective Order.  The Senior Prosecutor did not limit the search to documents identifying witnesses, exclude attorney-client communications from the search parameters, or provide instructions on what would constitute protected attorney-client communications.  The Chief Investigator understood that he was looking for attorney-client communications.

Prior to the search, the Chief Investigator recruited another State Investigator to assist with the search ("Assisting Investigator").  The Chief Investigator instructed the Assisting Investigator that they were conducting an investigation involving Defense Counsel, and that they were looking for written communications from the office of Defense Counsel to Defendant.[23]  The Chief Investigator did not mention

---

[23] *State v. Robinson*, ID No. 1411017691, at 13 (Del. Super. Nov. 21, 2017) (TRANSCRIPT).

to the Assisting Investigator that the search involved concerns about violation of a protective order.[24]

On June 30, 2017, the Chief Investigator directed DOC officials to seize all paper and documents from Defendant's prison cell. The Chief Investigator and the Assisting Investigator reviewed every piece of paper from Defendant's cell. During the initial review, the Assisting Investigator considered any and all communications from an attorney's office to be pertinent based on the Chief Investigator's instructions.[25] He provided such communications to the Chief Investigator for the final decision on which documents to seize from SCI for further review. The Chief Investigator seized twelve manila envelopes and five letter-sized envelopes that all bore Defense Counsel's letterhead, as well as a larger envelope that contained a federal transcript and pages of Defendant's handwritten notes, and brought them back to the DOJ in Wilmington for further review.[26]

Rather than having a review conducted by persons who were not part of the Prosecution Team, i.e. a "taint team," the Senior Prosecutor chose to place the documents in a large conference room for review by the Prosecution Team Paralegal. The Prosecution Team Paralegal reviewed the documents, which included letters

---

[24] *Id.* at 21.
[25] *Id.* at 29.
[26] *See* J. Ex. 3 at 1; *State v. Robinson*, ID No. 1411017691, at 187, 217-220 (Del. Super. Oct. 25, 2017) (TRANSCRIPT).

from Defense Counsel to Defendant and Defendant's handwritten notes on a legal pad and loose pieces of paper. The Prosecution Team Paralegal's review was detailed enough to conclude that Defense Counsel discussed the substance of redacted police reports with Defendant, and the Prosecution Team Paralegal reported her conclusions to the Senior Prosecutor.[27] At the end of her review, the Prosecution Team Paralegal concluded that Defendant was not in possession of any documents that were in violation of a protective order.[28]

### D. Members of the Prosecution Team Had Roles in the Seizure and Review of Defendant's Legal Materials

Members of the Prosecution Team were involved in the seizure and review of legal materials removed from Defendant's prison cell. First, the Lead Trial Prosecutor actively participated in the meeting wherein the Chief Investigator was instructed to seize documents from Defendant's cell.[29] Second, the Prosecution Team Paralegal conducted a substantive review of the documents seized from Defendant's cell even though the Prosecution Team Paralegal had a substantial and continuing role as a member of the Prosecution Team.

---

[27] *See* J. Ex. 5 ("However, there was one copy of a two page redacted FBI report in [Defendant's] possession as well as several pages of hand written notes detailing specific facts, witness statements, and other evidence all of which could have only been obtained via the police reports.").

[28] *Id.*

[29] *State v. Robinson*, ID No. 1411017691, at 84-85 (Del. Super. Oct. 25, 2017) (TRANSCRIPT).

13

Specifically, according to the State, the Prosecution Team Paralegal assists the prosecutors at the DOJ in ways that extend beyond her paralegal capacity.[30] The Prosecution Team Paralegal was responsible for organizing the voluminous discovery in Defendant's cases, maintaining records of discovery, and assisting in scheduling of witness interviews.[31] In addition, the Prosecution Team Paralegal was included on emails with the other members of the Prosecution Team and sat in on meetings with the Trial Prosecutors discussing the State's strategy for trial.[32] Indeed, the Senior Prosecutor testified that he chose the Prosecution Team Paralegal for the review because her role on the prosecution team meant that she knew the case and the discovery materials best.[33] With trial scheduled to begin on July 11, 2017, the Prosecution Team Paralegal was still involved in the final trial preparations, and was copied on various emails with the Trial Prosecutors regarding the witnesses and evidence for trial.[34] The Prosecution Team Paralegal was not officially removed from the Prosecution Team until July 14, 2017,[35] after the Court continued the July 11 scheduled trial.

---

[30] *Id.* at 233.
[31] *Id.* at 160-61.
[32] *Id.* at 259-260.
[33] *Id.* at 116.
[34] *See* J. Ex. 1 at A170-72, A173-76, A177, A178-79, A180; *see also* J. Ex. 7.
[35] *See* J. Ex. 8 at 4.

14

**II.    THE STATE'S SEIZURE AND REVIEW OF DEFENDANT'S ATTORNEY-CLIENT COMMUNICATIONS AND DEFENSE STRATEGY WAS NOT PROPER AND COULD NOT BE LEGALLY JUSTIFIED.**

The State argues that it was legally justified to conduct an independent and unauthorized search, seizure, and review of Defendant's attorney-client communications. Specifically, the State contends that it was not obligated to seek a warrant for its search because inmates have no Fourth Amendment protections in prison cells. However, the State's conduct in this case implicates Defendant's Sixth Amendment rights, not his Fourth Amendment rights. The State should have sought judicial approval.

**A.    *The State's Fourth Amendment Argument is Misplaced Because the State's Actions Actually Implicate Defendant's Sixth Amendment Rights.***

The State argues that it did not need a warrant to search Defendant's cell because the State does not need a warrant to search an inmate's prison cell. The State relies in part on an earlier opinion issued in this case where Defendant sought to suppress a drawing seized from his cell on Fourth Amendment grounds, and the Court ruled that Defendant has no reasonable expectation of privacy in his prison cell.[36] The State fails to appreciate the substantial differences between Fourth and

---

[36] *State v. Robinson*, 2017 WL 1363895, at *1 (Del. Super. Ct. Apr. 11, 2017).

15

Sixth Amendment jurisprudence and the difference between a drawing and privileged attorney-client communications.

Prisoners do not have a reasonable expectation of privacy in their cells.[37] However, the State's reliance on Fourth Amendment jurisprudence for its search of Defendant's cell targeting attorney-client communications is misplaced. While some constitutional protections, such as those arising under the Fourth Amendment, are limited for inmates, "prisons are not beyond the reach of the Constitution."[38] The United States Supreme Court has held that prisoners must be "accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration."[39] To that end, prisoners are consistently afforded their Sixth Amendment right to the assistance of counsel while incarcerated.[40] For example, prison officials are prohibited from listening to attorney-client meetings in the prison, recording attorney-client phone calls, or reading attorney-client correspondence.[41]

---

[37] *See Hudson v. Palmer*, 468 U.S. 517, 536 (1984) ("We hold that the Fourth Amendment has no applicability to a prison cell.").
[38] *Id.* at 523.
[39] *Id.*
[40] *See, e.g.*, *Jackson v. State*, 643 A.2d 1360, 1376 (Del. 1994) (holding that the State violated a defendant's Sixth Amendment right to counsel when its agent, the defendant's former cellmate, deliberately elicited incriminating statements from the defendant while he was incarcerated without a lawyer present).
[41] *See, e.g., Wolff v. McDonnell*, 418 U.S. 539, 577 (1974) (holding that prison authorities may open, but not read, attorney-client correspondence because reading such correspondence could cause a chilling effect on the communications between

16

The State concedes that DOC does not record phone calls by inmates with their lawyers, that the State does not read attorney-client correspondence, and that the State provides a confidential setting for attorney-client conferences when the client is incarcerated because those communications are privileged and protected under an inmate's Sixth Amendment rights. Nevertheless, when searching Defendant's cell, the State seized and reviewed Defendant's privileged and confidential attorney-client communications and documents containing defense strategy. The State's search implicated the Sixth Amendment, not the Fourth Amendment, and the State's argument based on Fourth Amendment jurisprudence that it did not need judicial authority must fail.

**B.** **The State Cannot Review Attorney-Client Communications Without Judicial Approval or Oversight.**

Attorney-client communications are generally protected by the attorney-client privilege. The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law."[42] Delaware has codified the attorney-client privilege in Delaware Rule of Evidence 502, which provides that confidential communications between the lawyer and client are privileged from

_____

lawyer and client); *see also In the Matter of Robert Neary*, 84 N.E.3d 1194 (Ind. 2017) (suspending a prosecutor for four years as sanction for listening to confidential attorney-client communications on two occasions).

[42] *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

disclosure.[43]  The purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."[44] The privilege applies "to all communications, whether written or oral, made for the purpose of facilitating the rendition of professional legal services."[45]  As a result, the State could not properly seize and review Defendant's privileged attorney-client communications without judicial approval and oversight.

Even the recognized exceptions to the attorney-client privilege require judicial approval to allow the State to review otherwise privileged communications.  Here, the State attempts to rely on the crime-fraud exception to the attorney-client privilege.  The crime-fraud exception provides that the attorney-client privilege does not apply if "the services of the lawyer were sought or obtained to enable or to aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime of fraud."[46]  According to the State, it was conducting an investigation into the "suspected unlawful activity" of Defense Counsel and Defendant.[47]  Specifically, the State claims that it was seeking evidence that a

---

[43] D.R.E. 502(b).
[44] *Upjohn*, 449 U.S. at 389.
[45] *Matter of Sutton*, 1996 WL 659002, at *4 (Del. Super. Aug. 30, 1996) (quoting *Zirn v. VLI Corp.*, 321 A.2d 773, 781 (Del. 1993)).
[46] D.R.E. 502(d)(1).
[47] State's Answering Post-Hearing Br. 17.

18

protective order had been violated, and such information, if found, would have fallen under the crime-fraud exception to the attorney client privilege.[48]

A violation of a protective order might qualify as a misdemeanor offense.[49] Nevertheless, application of the crime-fraud exception to the attorney-client privilege requires judicial oversight and approval. Under the Delaware Rules of Evidence, the existence of a privilege is a matter to be determined by the Court.[50] Therefore, if the State believed that attorney-client communications fell under the crime-fraud exception, the State should have sought an order from the Court for access to those communications.[51] At that time, the State would have needed to make a prima facie case that "the lawyer's advice was designed to serve his client in commission of a fraud or crime" to justify excepting the communications from the attorney-client privilege.[52] The State could not merely decide that the crime-fraud exception might apply and review Defendant's attorney-client communications based on its suspicion. Rather, the State was required to seek judicial approval.

---

[48] The Court notes that the State's argument regarding the crime-fraud exception contradicts its contention that it was not intentionally seeking attorney-client communications during its search of the cell.

[49] 11 *Del. C.* § 1271(3) (providing that a person is guilty of criminal contempt, a Class A misdemeanor, when the person engages in "intentional disobedience or resistance to the process, injunction, or other mandate of a court").

[50] D.R.E. 104(a).

[51] *See, e.g., Matter of Sutton*, 1996 WL 659002 at *1; *Playtex, Inc. v. Columbia Cas.*, 1992 WL 179232, at *1 (Del. Super. July 10, 1992).

[52] *Matter of Sutton*, 1196 WL 659002, at *10 (internal citation omitted).

Moreover, the Court notes that even if the State had sought judicial approval, it would have been denied. By the State's own admission, it did not have "substantiated" concerns that a protective order was violated.[53] The Court's inquiry would have revealed that there was no basis to intrude on the attorney-client privilege because no witness names had been produced by the State, Defense Counsel had permission to share the "content" of witness statements with her client, and the record evidence would have demonstrated that Defense Counsel had steadfastly refused to provide information to her client that would have violated the TMG Protective Order.[54] As a result, the State would not have been able to make the necessary prima facie case to justify excepting Defendant's attorney-client communications from the attorney-client privilege.

## C. The State Could Have Applied for a Search Warrant.

The Court is mindful of the fact that search warrants are not usually necessary for searches of prison cells. However, because the search specifically targeted

---

[53] The State contends that it was "premature" to contact the Court before its independent search and seizure because it did not yet have "substantiated" concerns. *State v. Robinson*, ID No. 1411017691, at 129-30 (Del. Super. Oct. 25, 2017) (TRANSCRIPT).

[54] On April 24, 2017, a clerk in Defense Counsel's office wrote to Defendant regarding a request he made via telephone to be sent witness statements and police interviews relating to the TMG Case. The letter states, "As [Defense Counsel] explained to you during your visit with her, we are unable to provide you with those materials because of the protective order that has been issued by the judge." *See* J. Ex. 1 at A136.

20

Defendant's attorney-client communications, the State should have applied for a search warrant. The State has previously obtained search warrants for prison cells in the past under similar circumstances.[55]

A search warrant may be issued only upon a showing of probable cause.[56] To obtain a search warrant, the State must set forth an affidavit in support which sets forth facts "adequate for a judicial officer to form a reasonable belief that an offense has been committed and the property to be seized will be found in a particular place."[57] A judge may find probable cause when "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[58]

The Court notes that the State would not have been able to meet the threshold standard for a warrant to issue in this case. As discussed above, the State did not have probable cause that attorney-client communications contained witness names that had been provided by the State because only one witness name had ever been provided.[59] Indeed, the State concedes that it did not have "substantiated"

---

[55] *See, e.g., State v. Cannon*, ID. No. 1001007728, at 4 (Del. Super. Jan. 3, 2011) (TRANSCRIPT).

[56] *Fink v. State*, 817 A.2d 781, 786 (Del. 2003); U.S. Const. Amend. VI; Del. Const. art. 1, § 6.

[57] *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006) (citing *Fink*, 817 A.2d at 787).

[58] *Id.* (quoting *Stones v. State*, 676 A.2d 907 (Del. 1996)).

[59] The State identified its witnesses for the TMG Case using letter designations in the discovery materials provided to Defense Counsel. The State identified one witness by name, because that witness provided exculpatory information subject to the State's *Brady* obligations.

21

concerns,[60] which is a lower standard than probable cause. The State would not have been able to establish probable cause that evidence of a crime would be found in Defendant's prison cell, because the State could not have established that Defense Counsel provided Defendant with witness names that had been provided to her by the State subject to the TMG Protective Order.

The State appears to argue that protective orders should shut down all meaningful trial preparation by defendants. For example, the State contends that even though Defense Counsel knew only one witness name, the State was concerned about the content of attorney-client communications because Defendant may have been able to deduce the identities of witnesses through the substance of the witness statements provided to Defense Counsel.[61] However, Defense Counsel was explicitly allowed to discuss the "content" of witness statements with Defendant.[62] To the extent that the State concerns arose solely from attorney-client

---

[60] *State v. Robinson*, ID No. 1411017691, at 129-30 (Del. Super. Oct. 25, 2017) (TRANSCRIPT).

[61] *State v. Robinson*, ID No. 1411017691, at 80-81 (Del. Super. Oct. 25, 2017) (TRANSCRIPT) ("…there could be something in a transcript which is identifying either a location or when they heard something. Even if the name is redacted out, something can be in that transcript that someone with certain knowledge could identify who that person is."); *see also id.* at 91-93 ("If someone says in a statement, 'Well, I was up on the hill that night,' that is a specific location in Wilmington, that might trigger, Well, I know who that is, then, just from some kind of an innocuous identifying remark that has no personal identifiers, that we would not redact out, but that might be – give a key to a defendant as to who someone is.").

[62] *See* J. Ex. 1 at A110.

22

communications about the "content" of witness statements, the State could not have established probable cause that Defense Counsel was in violation of the TMG Protective Order.

Moreover, in applying for a search warrant, the State would have been duty-bound to reveal to the Court that the State possessed information contradicting its claim that Defense Counsel showed Defendant documents in violation of the TMG Protective Order. For example, the Informant Inmate told the Lead Trial Prosecutor that Defendant attempted to obtain copies of witness statements and transcripts, and that Defense Counsel refused, explaining to Defendant that those documents were protected by the TMG Protective Order.[63] In addition, Defense Counsel previously clarified her duties under the TMG Protective Order and specifically sought and obtained permission to provide summaries of witness statements to Defendant.[64] Accordingly, the State would have been unable to establish probable cause that Defense Counsel violated a protective order.

Finally, the State's stated concerns about witness safety are not supported by the record. First, the State was solely seeking evidence that Defense Counsel violated a protective order, not that Defendant engaged in any witness intimidation. Second, the State's own actions undermine its assertion that witness safety

---

[63] *See* App. to Post-Hearing Br. at A59.
[64] *See* J. Ex. 1 at A135.

demanded immediate action. The Informant Inmate claimed to be relaying information from April of 2017. The State interviewed the Informant Inmate on May 10, 2017 and the Intermediate Inmate on May 16, 2017. Nevertheless, the record evidence suggests that the State did not take any further action in this investigation until June 9, 2017 when it issued the first subpoena for Defendant's phone records. Two more weeks elapsed before the State issued the additional subpoenas.[65] The State did not demonstrate any urgency with its investigation until the Senior Prosecutor unilaterally decided to search Defendant's cell on the same day that the Trial Prosecutors brought their concerns to him.

Moreover, although the State did not listen to the phone calls until June 28, 2017, the State had been informed that Defendant made the phone calls at issue in April 2017. Therefore, when the State made the decision to search Defendant's cell on June 28 or 29, 2017, two months had already passed since Defendant made the allegedly concerning statements. The State has not presented *any* evidence that witness intimidation actually took place during those two months, which undermines the State's claims that it had a legitimate concern about imminent witness intimidation by Defendant that necessitated an immediate and unauthorized search and seizure of attorney-client communications.

---

[65] The State issued a subpoena for the Intermediate Inmate's phone records on June 14, 2017 and a second subpoena for Defendant's phone records on June 20, 2017.

In conclusion, the State needed to seek judicial approval to seize and review Defendant's privileged attorney-client communications. The State could have and should have applied for a search warrant to satisfy that obligation.

### D. The State's Protective Order Investigation Should Have Proceeded with a "Taint Team."

Even if the State had sought and received judicial approval for its seizure and review, its entire Protective Order Investigation should have been handled by a "taint team." A "taint team" is entirely separate and independent of the prosecution team for a particular case, and can review privileged materials "to preserve the integrity of the attorney-client privilege."[66] An effective "taint team" would act as a wall or screen between itself and the prosecution team to ensure that no privileged communications or defense work product would be inadvertently disclosed to the prosecution team.[67]

Here, the State took no steps to screen the Prosecution Team to protect the integrity of the attorney-client privilege. Instead, the Prosecution Team was directly involved in the entire investigation. The Trial Prosecutors conducted interviews, issued subpoenas, listened to phone calls, and reviewed call logs. The Lead Trial Prosecutor met directly with the Chief Investigator to direct him on what to look for

---

[66] *See, e.g., State v. Cannon*, ID. No. 1001007728, at 7 (Del. Super. Jan. 3, 2011) (TRANSCRIPT) (citing *United States v. Hoffecker*, 530 F.3d 137, 153 (3d Cir. 2008)).
[67] *Id.*

in Defendant's cell. The Prosecution Team Paralegal directly reviewed Defendant's attorney-client communications and learned details of his defense strategy. The Prosecution Team Paralegal then continued working with the Trial Prosecutors on Defendant's cases. In addition, the Lead Trial Prosecutor facilitated the return of Defendant's documents, which were still in the State's possession a week after the seizure and review. Thus, even if the State had sought judicial approval, its search and review of Defendant's legal materials would still have been defective in light of the Prosecution Team's involvement and the State's failure to engage a "taint team."

## III. THE STATE'S VIOLATION OF DEFENDANT'S SIXTH AMENDMENT RIGHTS REQUIRES DISMISSAL OF THE INDICTMENT.

As will be discussed, this Court finds that the State's actions violated Defendant's Sixth Amendment rights. In addition, the Court finds that the State's conduct falls short of the Court's expectations for Delaware prosecutors. Dismissal is the only remedy that can adequately address the substantial prejudice suffered by Defendant and ensure that the State will not violate the rights of criminal defendants in the future.

### A. The State Violated Defendant's Sixth Amendment Rights.

An accused's Sixth Amendment right to the assistance of counsel for his or her defense is "fundamental to our system of justice" and "is meant to assure fairness

26

in the adversary criminal process."[68] The underlying purpose of the right to the assistance of counsel is to allow a defendant to make informed choices about his defense.[69] To that end, "Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the [S]ixth [A]mendment is to be meaningful."[70]

This Court previously addressed the legal standards applicable to finding a Sixth Amendment violation in its September 19, 2017 opinion and order.[71] The general rule under *Weatherford v. Bursey* is that a defendant must show prejudice to establish a Sixth Amendment violation.[72] Within the *Weatherford* framework, prejudice may be presumed if defense strategy was actually disclosed to the Prosecution Team.[73] In addition, a deliberate interference with the attorney-client relationship can constitute a Sixth Amendment violation even without a showing of prejudice.[74]

---

[68] *U.S. v. Morrison*, 449 U.S. 361, 364 (1981) (citing *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)); *see also Bailey v. State*, 521 A.2d 1069, 1083 (Del. 1987).
[69] *See U.S. v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978).
[70] *Id.*
[71] *See State v. Robinson*, 2017 WL 4675760 (Del. Super. Sept. 19, 2017, revised Oct. 17, 2017).
[72] 429 U.S. 545, 558 (1977).
[73] *United States v. Levy*, 577 F.2d 200, 209-10 (3d Cir. 1978).
[74] *See U.S. v. Morrison*, 602 F.2d 529, 532 (3d. Cir. 1979), *rev'd on other grounds*, 449 U.S. 361 (1981); *Weatherford*, 429 U.S. at 558 (finding that there was no Sixth Amendment violation in part because there was no "purposeful intrusion" by the undercover agent); *see also State v. Cannon*, ID. No. 1001007728, at 10 (Del. Super. Jan. 3, 2011) (TRANSCRIPT) (finding that a Sixth Amendment violation occurred

### 1. *Defendant Has Established a Sixth Amendment Violation Under the* Weatherford *Framework.*

The Court finds that the State violated Defendant's Sixth Amendment right to the assistance of counsel when analyzing the State's conduct under the *Weatherford* framework. Not only is prejudice presumed because defense strategy was actually disclosed to a member of the Prosecution Team, but Defendant has also established substantial prejudice as a result of the State's actions.

The Court conducted an *in camera* review of the documents seized from Defendant's cell, including attorney-client communications and Defendant's hand-written notes.[75] Based on its review, the Court concluded that the documents contained details of defense strategy. The Court informed the parties of its conclusion at the hearing on November 21, 2017.[76] To prevent any further disclosure, the parties agreed that the Court should not disclose any specifics about the defense strategy contained in the documents, choosing instead to make argument based solely on the Court's conclusion that the documents contained defense strategy.[77]

---

after the State *accidentally* seized a defendant's notebook containing privileged materials).

[75] A defendant's notes made in connecting with the investigation or defense of his case are protected from disclosure under Superior Court Criminal Rule 16(b)(2).

[76] *State v. Robinson*, ID No. 1411017691, at 54 (Del. Super. Nov. 21, 2017) (TRANSCRIPT).

[77] *Id.* at 70-76.

Prejudice is presumed because defense strategy was actually disclosed to the Prosecution Team. Where a member of the Prosecution Team conducted a detailed review of Defendant's attorney-client communications and hand-written notes, and thereby became privy to details of Defendant's defense strategy, the Court will presume that Defendant suffered prejudice sufficient to establish a Sixth Amendment violation.

Moreover, Defendant suffered actual prejudice. Even after the Prosecution Team Paralegal reviewed Defendant's attorney-client communications and learned details of defense strategy, the Prosecution Team Paralegal continued to work with the Trial Prosecutors to prepare for trial.[78] The State did not create a separate "taint team" or effectively screen the Trial Prosecutors to prevent further disclosure of Defendant's defense strategy and did not even remove Prosecution Team Paralegal until July 14, 2017, after the trial had already been continued.[79] Furthermore, the Trial Prosecutors were not effectively screened from the State's Protective Order Investigation.[80] For example, the Lead Trial Prosecutor directly met with the Senior

---

[78] *See* J. Ex. 1 at A170-72, A173-76, A177, A178-79, A180; *see also* J. Ex. 7.

[79] Prosecution Team Paralegal worked on the Murder case until being removed after the trial had already been continued *See* J. Ex. 8 at 4.

[80] The State's representations that the Trial Prosecutors were "screened" from the State's investigation after bringing their concerns to Senior Prosecutor is not supported by the record evidence. *See, e.g.,* State's Answering Post-Hearing Br. 17 8-9 (providing that the Trial Prosecutors were sequestered from the investigation and "sealed off" from any discussions about the investigation).

29

Prosecutor and the Chief Investigator before the search to tell the Chief Investigator what to search for in the cell. In addition, the Trial Prosecutors interviewed the Intermediate Inmate for the second time on June 30, 2017, the same day as the search, seizure, and review.[81] Moreover, the Trial Prosecutors were responsible for responding to the Court's initial inquiries about the search of Defendant's cell, and facilitated the return of Defendant's documents to him.

Therefore, prejudice is established under the *Weatherford* framework. Prejudice is presumed as a result of actual disclosure of defense strategy to the prosecution. Even if the Court did not presume prejudice, Defendant has demonstrated that the State's actions caused him to suffer substantial prejudice sufficient to establish a Sixth Amendment violation.

2. *The State Deliberately Interfered with Defendant's Sixth Amendment Right to the Assistance of Counsel.*

The Court finds that the State's conduct demonstrates a deliberate interference with Defendant's Sixth Amendment rights. The State argues that it did not deliberately interfere with the attorney-client relationship because it did not specifically search for Defendant's privileged attorney-client communications or review such communications for the purpose of learning Defendant's defense

---

[81] The State claims that the Trial Prosecutors' second interview of the Intermediate Inmate was unrelated to the State's investigation into the possible violation of a protective order, but rather was part of the Trial Prosecutors' preparation for Defendant's trial.

strategy. Rather, the State contends that it had a justifiable reason for reviewing Defendant's attorney-client communications. The State's arguments are without merit.

The State specifically targeted Defendant's attorney-client communications during the search. Although the Senior Prosecutor claims that he did not instruct the Chief Investigator specifically to search for Defendant's attorney-client communications, the Senior Prosecutor admits that he did not exclude such communications from the search parameters or instruct the Chief Investigator on what would constitute privileged attorney-client communications.[82] In addition, the Chief Investigator specifically instructed the Assisting Investigator that they were conducting an investigation into Defense Counsel and that they were looking for Defense Counsel's correspondence to Defendant.[83]

Consistent with those instructions, the Assisting Investigator flagged all attorney-client correspondence as pertinent during the search for review by the Chief Investigator.[84] Moreover, the smaller subset of documents that the Chief Investigator chose to bring back to the DOJ for further review predominantly consisted of attorney-client communications, and the Senior Prosecutor specifically

---

[82] *State v. Robinson*, ID No. 1411017691, at 132, 138 (Del. Super. Oct. 25, 2017) (TRANSCRIPT).
[83] *State v. Robinson*, ID No. 1411017691, at 13 (Del. Super. Nov. 21, 2017) (TRANSCRIPT).
[84] *Id.* at 29.

31

instructed the Prosecution Team Paralegal to review those documents.[85]  Therefore,

this Court concludes that the State specifically targeted Defendant's attorney-client

communications in its search, seizure, and review.

The State asserts that even though it intentionally reviewed Defendant's

attorney-client communications, it did not deliberately interfere with the attorney-

client relationship because it only reviewed the communications to determine if a

protective order was violated.[86]  However, the State has not provided any legal

support for its contention that it may independently review a defendant's privileged

attorney-client communications so long as it has some justifiable reason.  Such a rule

would vitiate the fundamental importance of the attorney-client privilege and the

Sixth Amendment right to the assistance of counsel.

By specifically searching for and reviewing Defendant's privileged attorney-

client communications, the State intentionally disregarded the fundamental

---

[85] Special Investigator seized twelve manila envelopes and five letter envelopes that all bore the letterhead of Defense Counsel.  Special Investigator only seized one other envelope, which contained some of Defendant's handwritten notes, because it contained a federal transcript.  *See* J. Ex. 3 at 1; *State v. Robinson*, ID No. 1411017691, at 187, 217-220 (Del. Super. Oct. 25, 2017) (TRANSCRIPT).

[86] State's Answering Post-Hearing Br. 16-17 ("First, the State did not purposefully intrude upon confidential communications between [Defendant] and his attorney to gain access to confidential defense strategy, or attempt to use manipulative tactics or an undercover informant to intrude into his attorney-client relationship.  Rather, the State sought relevant, first-hand evidence of whether a Protective Order had been violated.").

importance of free communication between Defendant and Defense Counsel,[87] which could cause a chilling effect on their attorney-client communications in the future.[88] The Court finds that the State deliberately interfered with the attorney-client relationship in violation of Defendant's Sixth Amendment right to the assistance of counsel.[89]

### B. The State's Conduct Falls Short of the Court's Expectations for Delaware Prosecutors.

The State's conduct was also in direct conflict with the fundamental role and duty of prosecutors. The duty of a prosecutor "is to seek justice, not merely convictions."[90] According to the Delaware Supreme Court,

---

[87] *See e.g., Upjohn*, 449 U.S. at 389; *Levy*, 577 F.2d at 209.

[88] *See*, *e.g., Davenport Group v. Strategic Investment*, 1195 WL 523591, at *1 (Del. Ch. Aug. 24, 1995) (stating that unnecessary interference with the attorney-client privilege causes a chilling effect on attorney-client communications because the truthfulness and scope of such communications decreases).

[89] As previously noted, there are some cases that suggest that even where there has been deliberate interference with the attorney-client relationship, the defendant must still show prejudice to establish a Sixth Amendment violation. *See, e.g., United States v. Boffa*, 89 F.R.D. 523, 533 (D. Del. 1981); *United States v. Voigt*, 89 F.3d 1050, 1071 n.9 (3d Cir. 1996). The Court concludes that those cases misstate the holding in *Morrison*, and declines to adopt their prejudice approach for deliberate interference cases. However, even if the Court were to conclude that a defendant must still show prejudice where there has been a deliberate interference with the attorney-client relationship, the outcome would not change. As discussed in more detail with respect to the *Weatherford* framework, the State directed a member of the prosecution team to review Defendant's privileged attorney-client communications, and thereby became privy to details of Defendant's defense strategy. Therefore, the Court concludes that Defendant suffered prejudice as a result of the State's deliberate interference with his attorney-client relationship.

[90] *Hughes v. State*, 437 A.2d 559, 566 (Del. 1981).

33

> A prosecuting attorney represents all the people, including the defendant who is being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial.[91]

However, the State did not do justice and ensure fairness for Defendant when it deliberately seized and reviewed his privileged attorney-client communications. Further, the State did not demonstrate concern for Defendant's right to a fair trial when it remained in possession of Defendant's legal documents until four days before trial was scheduled to begin, despite having no evidence that Defendant, or Defense Counsel, engaged in any wrongdoing.[92]

Furthermore, the State has demonstrated a seeming indifference to the serious constitutional issues at stake throughout these proceedings. For example, the State allowed the Senior Prosecutor, who authorized the search, seizure, and review, to appear as counsel for the State's response to the motion to dismiss until specifically instructed by the Court to involve counsel who would not be called to testify as a

---

[91] *Id.* at 566 (citing *Bennett v. State*, 164 A.2d 442, 446 (Del. 1960)); *see also McCoy v. State*, 112 A.3d 239, 262 (Del. 2015).

[92] The Court also notes that, despite having no evidence in support of its argument, the State has continued to suggest that Defense Counsel engaged in improper behavior. For example, in its most recent submission to this Court, the State wrote, "Apparently, to gain trust, [Defense Counsel] either violated the TMG Protective Order or duped her client into believing she was providing him more than was permitted." State's Answering Post-Hearing Br. 14. The Court finds that the State's *ad hominem* attacks against Defense Counsel are disrespectful and unprofessional, falling short of the Court's expectations for professionalism and civility for Delaware lawyers.

witness. In addition, the State failed to identify all persons who reviewed Defendant's documents when directed to do so, requiring the Court to hold a second evidentiary hearing in this case. The State also failed to conduct a comprehensive email search when directed to do so by the Court and, did not initially produce various emails responsive to the Court's inquiry. Further, a State's witness testified that he has previously conducted similar searches targeting a defendant's legal documents in other cases,[93] suggesting that the State may have engaged in other unauthorized reviews of attorney-client communications. Finally, the State's persistent refusal to accept any responsibility for improper conduct in this matter raises serious concerns that, absent a significant sanction, the State may engage in additional abuses in the future.

The State has ignored the fundamental importance of the Sixth Amendment right to the assistance of counsel and the attorney-client privilege, has demonstrated a disregard for Defendant's constitutional rights, and has exhibited a cavalier approach to the proceedings addressing its conduct. The State's misconduct requires a significant consequence.

---

[93] The Special Investigator testified that this was not the first time he had conducted a search for, and review of, an inmate's legal paperwork. *See State v. Robinson*, ID No. 1411017691, at 206-08 (Del. Super. Oct. 25, 2017) (TRANSCRIPT).

### C. Dismissal is the Only Effective and Appropriate Remedy for the Sixth Amendment Violation Under the Circumstances Presented Here.

When determining the appropriate remedy for a Sixth Amendment violation, the general rule is that "remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."[94] In this sense, a mere finding of a Sixth Amendment violation does not automatically require dismissal of the indictment.[95] Rather, the Court must analyze whether dismissal is appropriate in light of the circumstances of each case and the prejudice suffered by that particular defendant.

Here, the State argues that, even if it violated Defendant's Sixth Amendment rights, Defendant did not suffer prejudice sufficient to warrant dismissal of the indictment. The State relies on *Morrison*, *Bailey*, and *Cannon* for the general proposition that dismissal is inappropriate "absent demonstrable prejudice, or substantial threat thereof."[96] In those cases, the courts concluded that dismissal was inappropriate under the particular circumstances. This Court concludes that those cases are inapposite for two reasons. First, in the case before this Court, Defendant

---

[94] *Morrison*, 449 U.S. at 364; *see also Bailey*, 521 A.2d at 1084.

[95] *See Morrison*, 449 U.S. at 365; *Bailey*, 521 A.2d at 1085-86; *see also Levy*, 577 F.2d at 210 (conducting a separate and independent remedy analysis even after presuming prejudice to find a Sixth Amendment violation).

[96] *See Morrison*, 449 U.S. at 365; *see also Bailey*, 521 A.2d at 1086; *State v. Cannon*, ID. No. 1001007728, at 9 (Del. Super. Jan. 3, 2011) (TRANSCRIPT).

suffered substantial prejudice as a result of the State's conduct.[97]   Second, the cases

upon which the State relies did not involve such an egregious and intentional

violation of a defendant's Sixth Amendment rights as exists here.

       1.     *Unlike the Defendants in* Morrison*,* Bailey*, and* Cannon*, the Defendant Here Did Suffer Substantial Prejudice as a Result of the State's Actions.*

In *Morrison*, *Bailey* and *Cannon*, the respective courts found that the

defendants did not suffer sufficient prejudice to warrant dismissal.  However, those

cases did not involve the same level of prejudice present in this case.  Here, the Court

finds that Defendant suffered substantial prejudice as a result of the State's actions.

In *Morrison*, two DEA agents pressured the defendant to cooperate with their

investigation outside of the presence of counsel.[98]   At the same time, the agents

disparaged defendant's counsel.[99]   The defendant moved to dismiss, but did not

argue that she suffered any prejudice as a result of the agents' actions.[100]   There was

no showing that the attorney-client relationship had been damaged or that the agents

obtained any privileged information from the defendant as a result of these

---

[97] *See Morrison*, 449 U.S. at 365 (finding that dismissal is inappropriate *unless* the defendant suffers demonstrable prejudice or the substantial threat thereof).
[98] *Id.* at 362.
[99] *Id.*
[100] *Id.* at 363 ("The [defendant's] motion [to dismiss] contained no allegation that the claimed violation had prejudiced the quality or effectiveness of [the defendant's] legal representation; nor did it assert that the behavior of the agents had induced her to plead guilty, had resulted in the prosecution having a stronger case against her, or had any other adverse impact on her legal position.").

encounters. As a result, the United States Supreme Court concluded that the defendant did not suffer prejudice as a result of the agents' actions and, therefore, that dismissal was inappropriate.[101]

In *Bailey*, the defendant moved to dismiss, arguing that prison officials interrupted phone calls with his attorney and destroyed documents he had prepared to show his attorney.[102] However, the prosecutors for the defendant's case were not at all involved in the challenged activity, such that there was no injury to the attorney-client relationship and no concerns that the prosecutors were privy to the defendant's privileged communications. As a result, the Superior Court denied the motion to dismiss, concluding that any missing documents could easily be recreated and obtaining assurances that defendant's future phone calls would not be interrupted.[103]

In *Cannon*, the State became concerned that the defendant was fabricating an alibi.[104] The State obtained a search warrant to search the defendant's cell, but specifically excluded attorney-client communications from the search parameters.[105]

---

[101] *Id.* at 366.

[102] *Bailey*, 521 A.2d at 1083.

[103] *Id.* at 1085.

[104] *State v. Cannon*, ID. No. 1001007728, at 3 (Del. Super. Ct. Dec. 20, 2010) (TRANSCRIPT).

[105] *State v. Cannon*, ID. No. 1001007728, at 4-5 (Del. Super. Jan. 3, 2011) (TRANSCRIPT).

During the search, the investigator accidentally[106] seized a notebook containing case law citations and other material that may have been privileged.[107]  As a result, the defendant moved to dismiss.  However, the trial prosecutors were not involved in the search and seizure and did not see the contents of the notebook.[108]  Further, the State had already been aware prior to the accidental seizure that the defendant's defense would focus on a potential alibi.[109]  Therefore, because the trial prosecutors were not exposed to privileged information and because the State did not obtain any legal advantage as a result of the accidental seizure, the Court concluded that dismissal was not an appropriate remedy.[110]

*Morrison*, *Bailey*, and *Cannon* did not involve the same level of prejudice suffered by Defendant in the instant case.  Here, the State intentionally chose to have the Prosecution Team Paralegal, a member of the Prosecution Team, review Defendant's privileged attorney-client communications, which caused her to learn

---

[106] It is noteworthy that in *Cannon*, the Delaware prosecutors obtained a warrant and accidentally seized a notebook, which was not the subject of their search, and conceded the Sixth Amendment violation.  It shocks the conscience of this Court that the Delaware prosecutors in this case took such a radically different approach and demonstrate such a cavalier attitude towards this Defendant's Sixth Amendment rights.

[107] *State v. Cannon*, ID. No. 1001007728, at 6-7 (Del. Super. Jan. 3, 2011) (TRANSCRIPT).

[108] *Id.* at 7-8 (finding that the prosecutors immediately took steps to ensure that they were not exposed to any privileged information after the accidental seizure).

[109] *Id.* at 10-11.

[110] *Id.* at 13 (finding that limited the investigator's continued involvement with the case was adequate to remedy the constitutional violation).

details of defense strategy. The State then allowed the Prosecution Team Paralegal to remain on the Prosecution Team and work with the Trial Prosecutors on the State's final preparations for trial. Moreover, the Trial Prosecutors were not effectively screened from the investigation, and the State's actions have caused a significant delay in Defendant's prosecution. In the meantime, Defendant has been detained. Defendant has suffered substantial prejudice as a result of the State's actions.

2.  *The State's Conduct in this Case is Significantly Different than its Approach in Other Cases.*

This Court is particularly struck by the contrast between the State's behavior in *Cannon* and in this case. In *Cannon*, the State had concerns that the defendant was fabricating evidence, so it obtained a search warrant to search the defendant's cell and specifically excluded attorney-client correspondence from the search parameters.[111] The State seized privileged materials *accidentally*, and the trial prosecutors were so concerned about the potential constitutional violation that they immediately took steps to prevent any further exposure of the privileged materials.[112]

In stark contrast, in the case before this Court, the State claimed to have concerns that a protective order had been violated. In response, the State made a unilateral decision to search Defendant's cell with no judicial oversight, and

---

[111] *Id.* at 4-5.
[112] *Id.* at 7-8.

40

specifically targeted Defendant's attorney-client communications in the search. Moreover, the State chose to have a member of the Prosecution Team review Defendant's privileged communications, and then failed to screen her from the Trial Prosecutors, who were already not effectively screened from the investigation. Upon instruction by the Court to assign different counsel to respond on behalf of the State, the Senior Prosecutor appeared even though he would later be identified as a key witness. Then, the State failed to comply with this Court's orders to produce all relevant documents and to present all witnesses with knowledge of the search and seizure.

The State's conduct constitutes a significantly more serious violation of Defendant's constitutional rights than existed in *Cannon* or in the other cases on which the State relies. The Court finds that the State's behavior weighs in favor of dismissal.

> 3.   *No Lesser Sanction Would Adequately Address the State's Intentional Conduct.*

The State not only argues that dismissal is inappropriate in this case, but also that Defendant is not entitled to *any* remedy for the violation of his Sixth Amendment right to the assistance of counsel. The State emphasizes the fact that trial has not yet taken place, and argues that any prejudice suffered by Defendant could be rectified before trial. However, the State's position would mean that it can intentionally review a defendant's privileged attorney-client communications at any

41

time before trial without any consequences. Such a rule would vitiate the fundamental importance of a defendant's right to the assistance of counsel and give the State a license to violate the Sixth Amendment rights of defendants in the future.

Here, the Prosecution Team Paralegal has already been removed from the Prosecution Team, and the July 2017 trial was continued. Although the State has not even suggested an alternative remedy, the Court has considered, for example, requiring that all members of the Prosecution Team be replaced on any of the cases involving Defendant and that any work product they developed be destroyed so that a new prosecution team would have to develop a new strategy without any taint from the Protective Order Investigation. Of course, it would also not be acceptable for the Senior Prosecutor, Chief Investigator or Assisting Investigator to work on the Murder Case or TMG Case. In the meantime, Defendant's release on pre-trial supervision could also be considered given the long delay occasioned by the State's misconduct, during which time Defendant has been detained.

This Court concludes, after careful review of the record and after much consideration, that these remedies are inadequate because the prejudice to Defendant is much broader, and the affront to the rule of law is more profound, than can be addressed by these limited remedies. It is not that the State may not engage in an investigation involving concerns about a breach of a protective order; rather, procedural safeguards were required: judicial oversight to ensure due process and

42

effective screening to ensure that no privileged communications or defense work product would be disclosed to the Prosecution Team. The constitutional rights of criminal defendants must be respected by the State and the rule of law demands accountability of prosecutors to the Court.[113] The nature of the violations of this Defendant's Sixth Amendment right to the effective assistance of counsel require dismissal of the Indictment because any lesser sanction would unduly depreciate the seriousness of the State's actions and the extent to which the State's actions put at risk the most fundamental constitutional protections.

## CONCLUSION

This Court has thought long and hard about this matter and has weighed the competing concerns. Upon careful consideration of the decisional law, the Court's findings of fact based on its review of the record evidence, and the Court's *in camera* review of the documents seized, the Court finds that dismissal of the Indictment is required. As the United States Supreme Court has recognized, "the severe remedy of dismissal … is a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried."[114] However,

---

[113] *See, e.g., United States v. Leon*, 468 U.S. 897, 979-80 (1984) (Stevens, J., concurring in part and dissenting in part) ("We could, of course, facilitate the process of administering justice to those who violate the criminal laws by ignoring the commands of the … entire Bill of Rights — but is it is the very purpose of a Bill of Rights to identify values that may not be sacrificed to expediency. In a just society those who govern, as well as those who are governed, must obey the law.").

[114] *Barker v. Wingo*, 407 U.S. 514, 522 (1972).

while it may be distasteful to dismiss an indictment before trial, the rule of law demands that protection of constitutional rights outweighs considerations for the outcome of any individual case.[115]

Here, the State violated Defendant's Sixth Amendment rights when it intentionally seized and reviewed Defendant's privileged attorney-client communications and when there was actual disclosure of Defendant's defense strategy. While it is unfortunate, dismissal is the only remedy that will adequately and effectively address the Sixth Amendment violation for this Defendant. In addition, dismissal is the only consequence that will deter the State from violating the Sixth Amendment rights of criminal defendants in the future.

**NOW, THEREFORE, this 1ˢᵗ day of May, 2018, Defendant's Motion to Dismiss is hereby GRANTED and the Indictment is hereby DISMISSED.**

**IT IS SO ORDERED.**

*Andrea L. Rocanelli*

_____

**The Honorable Andrea L. Rocanelli**

---

[115] *See id.* (concluding that dismissal before trial is unfortunate, but is sometimes the only appropriate remedy); s*ee also Strunk v. United States*, 412 U.S. 434, 439 (1973) ("[S]evere remedies are not unique in the application of constitutional standards.").